Climate and EEOC v. Hora Good morning, and may it please the court, I'm Tom Neuberger, and I'm the attorney for Janet Barnett here of the Pennsylvania Bar, and with me is my co-counsel Stephen Neuberger, and I'd like to reserve one minute for rebuttal if I could. Granted. This case was a seismic event for the employment bar in our circuit for four reasons. The first, and key of which, was whenever the attorney-client privilege is violated, it affects the administration of justice because it's such a substantial pillar of our system. There were three other duties imposed by the district court relating to a duty of candor in written submissions to the EEOC, when you can disqualify an attorney as trial counsel when you want to cross-examine a witness who he's interviewed, and most importantly, a duty saying that in small organizations, clerical employees can be considered managers, but the district court, under Rule 4.2, was applying the wrong text of the rule. But the key here is the attorney-client issue, and the district court, at page 6, clearly held that at no time ever was Ms. Richardson the client of my client, Janet Barnett. But before we get to that, at no point in your papers to the district judge on the disqualification motion, and at no point during the hearing on the disqualification motion, was the phrase attorney-client privilege even mentioned. The written submission of my client has a long paragraph on the advice she gave to Ms. Richardson. The phrase attorney-client privilege was not used. Not mentioned. Not mentioned at all. It had been dealt with by the magistrate several times. It had been taken to the district court. It was final, and it was the law of the case. So, well, you say that. For our purposes, we are hearing an appeal from the disqualification of your client. For our purposes, was the issue waived? And only if it wasn't waived should we be hearing argument on whether there was an attorney-client privilege. Correct? Absolutely, it was not waived. Then where was it mentioned? Where was it even mentioned before the district judge? In the supplemental submission by my client at page 5. This is appendix A155. My client stated the defendants had not cited a single case in support of the proposition that she had an obligation to disclose to the defendants the information obtained from two persons who had sought legal advice from her. If that's raising the attorney-client privilege, you know, I'll eat my hat. The district court made a specific finding that there was no attorney-client privilege. Did not make a finding of waiver, and what happened, Your Honor, was No, because it wasn't raised to her. Then there was no need to make the finding. There was a finding made, okay?  I had to go out and get a lawyer to represent her, and I believe the lawyer did not appeal within the 10 days of taking the thing up from the magistrate, and it then became the law of the case. But in all fairness, all we have to do is analyze the 35-page opinion from the district court, and the 35-page opinion is based on 21 pages of emails found at A83 to 103, okay? The entire opinion is based on those communications. The district court had before her the communications which very clearly indicated that these were attorney-client communications. Well, now, let's get into that a little bit. When do you suggest that there was an attorney-client relationship? At what point? If you have a date. Yes, it's August 7th, and I'll explain why, okay? We started at page A296. So everything before August 7th is not proven. No, August 1st, there's a term in the disciplinary rules. You're called a prospective client when you're first consulted. Here's my issue. Maybe you can deal with this. What I see until September 12th at A100 where finally Richardson says, I'd like to discuss my options with you, which I think you can argue that that is the start of an attorney-client relationship. What I'm seeing is a lot of offers to represent her, which I don't think constitute an attorney-client relationship. And I'd like to explain why that's a misperception, Your Honor, okay? There's a greater context. I think we have to start. Beverly, the underlying client in the EOC action, is fired on the 23rd. On the 27th, if you look at 296 in the appendix, the witness, Richardson, writes a three-page single-space letter to the president of management. But you're talking about July now. It's July, yeah. July. Because August 1st is when my client's first contacted by Richardson, okay? Four days before. No, I think July 25th was the date of their first meeting. With Beverly, not Richardson. No, with Richardson. No, no, Beverly. All right. Beverly's the plaintiff in the case. Okay. On the 27th, she writes to the president of the management company and says, under the employee handbook, I have a duty to report harassment in the workplace. When you say she, you mean Richardson? Richardson, the witness. All right. I have a duty to report harassment in the workplace. I'm reporting this Nelson Garcia fellow, okay? And Beverly was also a victim of harassment in the workplace. So she is invoking the protections of the EEOC. And that concludes with this guy, Nelson, is a danger to guests because he can make keys. We now go to, we now start on August 1st and work our way forward. If you look at A97, the very first line of the email from Richardson to, well, from Barnett back is, thank you for the letter, the encouraging letter. That's the letter of the 27th. And the handbook, okay? The handbook that she's invoking for protections under. Then she says, I may be able to speak with you if you want to be my client. But she ends the next page on page 16.  Then what happens? We jump to page 13 at A95. Richardson writes back on the 7th. I am not a manager. She says, these are my clerical duties. And then we're missing the next paragraph, the next sentence. My job is hanging by a thread. Then she goes on. They know who I am. They know how I feel about it. That is referring back to the 27th letter where she opposes discrimination in the workplace. She feels her job is on a string. And then we look at on 15, the very last sentence of the email. They will find a way to make my life hell. Okay, and that was the basis for this. If indeed they retaliate against her, if indeed they retaliate against Richardson, then she will or may consider representation by your client. No, and here's why, Your Honor. Why could she send her deposition on a number of, at a number of points? Let's look at what happened in the email traffic. I don't want you to spend all your time on this because she was disqualified under various rules of professional conduct. And I think that if we were not to agree with you on attorney-client, you better get to them real fast. All right, and I believe if you agree with me on attorney-client, it colors all the other conclusions, and I have to finish with two more emails. If we look on page 13, which is A95, Barnett responds to this, I'm hanging by a thread, and says, It would help for you to have a letter which reminds them that retaliation is prohibited. Okay? And then if you go to page 17, this was her September 11th resignation letter, she says she followed the August 7th advice. Third paragraph. On August 7th, I told them orally that I'm protected by statute, that it is illegal to retaliate against me. My client, Janet Barnett, on the 7th, told her she's protected by the opposition clause. The client followed her advice, verbally told them, invoked the protections of the opposition clause, and that's revealed on page 17. We go forward, we go forward in the email. Okay, August 8th, Richardson comes back again. They interrogated us all today. I asked Mike, Am I going to lose my job? Am I going to lose my job? I cited the handbook to them. In this email here, she mentions this handbook. This is on page A92, Your Honor. A92, we're going down the left-hand side. I asked Mike repeatedly, Am I going to lose my job over all this? That's in the middle there. She cites the handbook the first time. The handbook that's in the opposition clause letter, the handbook that she gave to my client with the very first contact, the handbook that the judge said my client shouldn't have had in her possession. She had the handbook in her possession because the client gave it to her so she could give him advice on what her rights were under the handbook. But more importantly, the first two-thirds of that email were about the handbook. Then she says, Yes, Your Honor. When she says the client gave it to her, you're referring to Beverly or Richardson? Richardson. Richardson is the witness. Because what happens, Your Honor, is Beverly is fired on the 22nd or 23rd, and Richardson and Schneider go to her as she's on the way out the door and have two days' worth of communications with her before she ever goes to my client. But my point is, in this email, she says that management has told me that Garcia had two written warnings against him. Management has told me that they knew Garcia was on parole. So she's giving this information to her attorney, okay, to show that there's a reasonable basis for her to believe that she's going to be retaliated against, okay? And then she says management questioned me on the timesheets. Management is questioning. Beverly had said, Beverly was the night auditor and Nelson's the day auditor. Beverly said he made me watch a pornographic movie in the lounge. That's one of the reasons why I complained about sex harassment in the workplace. You know, your yellow light is on. You haven't said a word about 4.2 or anything else. Well, my point is, if you carefully look at the emails, you will see that she was a prospective client on the first. She became a client over the next six weeks. She was a client over the next six weeks because she was giving advice and it was being followed, okay? The answer to 4.2 is quite simple, Your Honor. The district court was applying the wrong rule, first of all. The district court quoted the text of the rule in its opinion. The ADA Ethics 2000 Commission recommended a change in the rule to get rid of this whole managerial concept, and the Supreme Court of Pennsylvania adopted that in January of 2005. Well, of course, the court also found that she had violated 8.4 and 4.4, so, you know. Okay, but the point is, under the present rule, there is no managerial concept because the managerial concept was found by the commentators and the reporters to be vague. That's 4.2. 4.2. What about 4.4 and 8.4? 8.4 is simply a catch-all. If she has not violated the other rules, she will not have violated Rule 8.4. You're asking about Rule 4.4, Your Honor? Yes. If all these conversations are protected by the attorney-client privileged, then they're in an entirely different context. If they're not protected by the attorney-client privileged. If they're not protected, she is a mole, and all the lawful things the trial judge said about her are true. Now, wait a minute. You're conceding that if she's not protected by the attorney-client privileged, she violated 4.4? If she's not protected by the attorney-client privileged, you're looking at this and you're saying she has no— the district judge said she has no right to be communicating with these people. Rule 4.2 says she was unethical in gathering evidence. Was the district court right then? No, the district court is wrong in how it analyzed the five documents. The first document was the employee handbook. No, no, no. I don't think that's a question. Go back to the question. If indeed she was not protected by attorney-client privileged, is it your position that the district court correctly found a violation of 4.4? No. It is not my position. Okay. Why was the violation of 4.4 found incorrectly? Because the kinds of communications the court was talking about, some of them occurred in those three days when Richardson and Schneider were going to Beverly before my client got involved. The other conversations had to do with information that was either in the public domain or which was unsolicited or which my client warned the witnesses that they were being over-eager. I still believe that even if there's no attorney-client privilege, and I don't see how we can conclude otherwise, my client was still acting in good faith and there is no clear evidence that my client had selected these people to be some sort of a mole. Okay. I think that answers the 4.4 question. All right. We'll get you back when we get back. All right. Thank you, Your Honor. May it please the Court, my name is Andrew Howen. I'm the attorney for Appli Hora, Inc., which was the owner of the hotel. Just following up on the first question that the Court asked this morning on the issue of waiver, we have briefed that issue, but it's the position of Appli Hora that the issue could have fully been raised and addressed below. As a matter of fact, you'll see in the transcript of the hearing that Judge Prater started that hearing by pointing out to everyone the significance of the hearing, the severity of the ruling that may come out of it, the impact on the case, and invited the parties to have any oral argument and submit any evidence that the parties deemed necessary. So there's full opportunity to raise and address that issue. Secondly, that issue was previously raised in front of the magistrate. There was a motion for reconsideration, which was denied, and that became the law of the case. On the issue of, and I want to take one step back. When we look at what the district court did in this case, and we look at the type of review of that decision, what the appeals court would focus on is looking at whether the court abused its discretion in policing the conduct that occurred below. Because of that, the court would not be reweighing the equities of what went on below or reassessing the facts. And the appellant's brief... Well, unless we find some of the facts were clearly erroneous. That's correct, Your Honor. Unless they're clearly erroneous, then the court can readdress those facts. That's correct. What about the attorney-client issue? Was there an attorney-client relationship at any point between Richardson and Prater? Appellees would assert there was not. Ever? Ever. As Judge Berry said. What about a prospective client? Prospective relationship? There was a prospective relationship, but it never came to fruition. She testified, Ms. Richardson testified. If there was a prospective relationship, was the communication during that period where Richardson was a prospective client protected? I do not believe the record is clear that she was a prospective client. I thought you just said there was. No, I thought your question was, could there have been a prospective relationship? What I'm stating is, based on the record we have, there was not a prospective relationship. One could say when Richardson first met with Barnett that anything she told her, she told, she, Richardson, told Barnett, that would go to the possibility of future representation could be privileged. Could one not? But there never was a future relationship. Correct. Indeed, there was never any follow-up stating, and typically we would have a lawyer following up and saying, thanks for meeting today. We discussed your potential claim. Send a check. Right, send a check and here's the engagement. And that never happened. Instead, they go back to the issues of what was going on, who was doing what, who said what, who was there, who was not. And that's the other piece. I mean, the emails are laced with information that are totally unrelated to Ms. Richardson and potential client retention as a client. I mean, these issues go well beyond whether she was retaliated against, which, P.S., never happened. But the important thing is, I mean, you're asking what was going on, and she's saying the EEOC information is coming across the facts. Let me tell you what was there. Let me tell you who was interviewed. This wasn't in the context of I think this is relevant to my potential claim. It was related to Manesta Beverly, who was one of the class plaintiffs with the EEOC. And she conceded. At her deposition, she wanted to help Beverly. Correct. I have a couple of concerns in this case, and let me just articulate them. I was very surprised to see you taking the very harsh step, in my judgment, of moving for an attorney's disqualification under the facts that I see in this case. And it's a very, very significant step. And the district judge's opinion, the tenor of that opinion, was as harsh as I've seen in some time, and I've been around for a while. And it was based on the district court's conclusion that Barnett was setting up Richardson. And, indeed, that Richardson finally became the captain of the ship, even though you said she was basically a clerk. Those things bother me. Maybe you can address them. Your Honor, a couple of points. First of all, the timing of when the disqualification was brought evidences the seriousness of the appellees in making the decision to even raise it to the court. Specifically, if you look at the context of the record and you look at the issue, Appellee Hora, Inc., a small company, actually is a father and daughter who own this hotel. That's their only asset beside a restaurant on the facility. Their focus was defending an EEOC class action claim. An EEOC class action claim is a very significant thing, especially for a small hotel. The focus was on trying to defend Hora and trying to have that matter resolved in favor of Hora with respect to the EEOC. As you will see in the record, there were three or four attempts to have a pretrial settlement conference with Judge Prater. And it was the full intent of the parties to attempt to resolve, and especially appellees, to resolve the matter. If the matter had been resolved at those conferences, this issue would not have needed to be brought. And the reason is, one of the things we haven't even talked about that is a necessary combination of the whole motion is the Rule 3.7 issue. And Rule 3.7 issues whether Ms. Burnett would have been a witness. What about Richardson? You say Richardson would have been a witness. I cannot even begin to imagine how you would ever have called Richardson to testify for anything. She was bitter. She was angry. She hated you all. You're going to call her as a necessary witness? She would have to be. We would call her as a plus examination as a hostile witness. But certainly the other side was going to bring her as a witness, and we'd have a right to impeach her. I can't believe you would call Burnett now. Why would Burnett be a witness? She would be a witness. A necessary witness. A necessary witness in the main respect. One of the issues is that the EEOC in this case issued a letter of determination finding fault with the hotel, which, as I'm sure the court knows, is a significant event for an employer. To have the EEOC make a formal finding of a violation of Title VII in here arguing class action status. The position of the hotel at the EEOC level and at the district court level is that that finding was tainted. That that finding was a rush to judgment based in large part upon information that Richardson had supplied to Ms. Burnett and that Ms. Burnett had supplied to the EEOC with the spin and without our knowledge. So if the district court, and this was addressed, discussed below with the district court at oral argument, if the EEOC, which I fully anticipated they would do, would seek to admit that letter of determination as evidence in the case, as fault by Hora, as evidence of fault, as evidence of liability, Hora would have the absolute. Those letters don't come in as evidence of liability. It's split in the eastern district right now. The case is subject to the sound discretion of the court. The decisions are some in favor and some against. And we didn't have the luxury of assuming that the district court was going to rule conservatively and not allow that letter in. I'll grant to the court that the majority of the time those letters don't come in. But they do come in. So you think if it came in you'd have the right to, in effect, retry, put on a mini trial on the letter? Absolutely. Because, and this would be the issue, below the EEOC's investigation was not a thorough investigation. They didn't even have a fact finding before they found out. The time is running, so let's assume you could do that now. But the district court never weighed, the other factor that should be weighed in this is whether it would be a hardship to the client, right? There's not a word in the opinion about that. There is discussion by the court as far as what the impact of Ms. Beverly would be. And the court discusses up front recognizing that there could be a potential impact. And that's why you see the judge say, I have the ability to move the trial back. If your concern is that there's going to be pressure put on the intervener here because there was a short trial, as of the time of the decision, I'll move the trial back, which is what she did. But in addition, Judge Prater spent a significant amount of time talking about the complicated nature or lack thereof in this case. The very basic fact pattern and the fact that the EEOC was lead counsel to Ms. Beverly. And the same exact issues that were going to be addressed by EEOC at trial were the factual issues that were going to be addressed by the EEOC. The district court was under the assumption, not more than the assumption. The district court said two or three times just during the hearing itself, and then another couple of times in the opinion, that in spite of what you and Mr. Kerman had said at the hearing, that Richardson was the arms, legs, ears, and eyes of management. So that was assumption number one, which was belied by anything in this record that I can say. But based on that assumption, the district court went to the second conclusion, which was that Barnett was the bad guy here. Barnett went into the arms, eyes, legs, feet, or whatever it is, of this company, knowing it was, and inserted Richardson as a mole. But that isn't the way it happened, according to the record. Well, according to the record, what happened is this. Richardson couldn't wait to give everything she could find to Barnett. That's correct, but then she was further directed. To call Barnett, to describe what Barnett did as inserting a mole into the highest levels of this company, i.e. Richardson. Seems to me belied by the record. Your Honor, what I said at the oral argument was, when asked whether she was a managerial employee, I said to the court she was not a managerial employee, and that's what I believe you're stating to me now. I said that in the record, and that's correct. But the issue is what information she was providing to Ms. Barnett, and then the facilitation and the continuation of that information. A non-confidential handbook, a page from TV Guide showing that a movie was probably soft porn, and a couple of other things. But also the draft EEOC statements, a statement made by my client in the attorney-client context. I mean, there were additional issues that were significant. And the final thought on that, as the judge said below, this is not a large-sized corporation with a hierarchy. I mean, the office in that company literally could fit between the space between me and you. And there were three people in that office, and they shared it, and that was the owner representative, Ms. Cooper-Lewis, Mr. Carr, the general manager, and Debbie Richardson. And all the files were there. So she was right there. Thank you. Can I ask one last question? Absolutely. On the particular issue of Rule 4.2, Ms. Barrett made an inquiry about your client, sorry, Richardson, about what she did. Exactly what more should she have done? Ms. Richardson or Ms. Barnett? Barnett, rather. Ms. Barnett, when it became apparent that this information that was coming out was confidential, was it? I'm talking about with respect to the violation of Rule 4. Correct. I understand, because I think your question is initially she had an inquiry, are you a manager or aren't you? Right. And Ms. Richardson said, no, I'm not. And Ms. Barnett said, good, then I can talk to you. That was the initial inquiry. And my point is that during the course of those emails, you see the information ratchets up, and there's more sensitive information coming out. At that point, as I mentioned in the oral argument to Judge Pratt and what bothered Hora, Inc. the most, is that there wasn't written admonition to Ms. Richardson saying, look. It didn't bother you enough to move for her disqualification under 4.2. You didn't mention 4.2 until the district court had oral argument, showed that she had, she said, I'm interested in this rule. Correct. And then in your supplemental memo, you mentioned 4.2. But you never moved to disqualify her under 4.2. That's correct. Because you believed she was a clerk, too. And my statements in the oral argument address that issue. Thank you very much. Thank you. Good morning. May it please the Court, Howard Kerman for happily martial law judgment. Just to pick up on the last point, Your Honor, which had to do with the point that Judge Pratt made in lower court about 4.2, is that she did raise it sui sponte. We had some questions internally about it because the law seemed to be a little unsettled because of the lack of managerial status. But that went to Judge Pratt's point. And I don't think that she ever said that Ms. Barnett put Ms. Richardson in the position of being a corporate mole. I think what she said was she exploited that position, that she knew that she was in that position, and she used Ms. Richardson to get and exploit this information. She set up Richardson to become a mole. Whether she became a mole or whether she was a mole or whether she acted like a mole, the point is, Your Honor, that the information that Ms. Richardson gave to Ms. Barnett redounded to the detriment of Mr. Harrell's client and to my client as well. I wanted to just spend whatever time is left. Well, sure. Of course. Of course it did. But let's go back. That's why you wouldn't have called Richardson. But let's go back to her deposition because when we took her deposition, Your Honor, I'm talking about Ms. Richardson, and repeatedly asked her, were you engaging Ms. Barnett as your attorney? Was there an attorney-client relationship? And it was clear in her deposition testimony that she said that she had not. Furthermore, Judge Rappaport, during that deposition, asked her when we broke up because we got into a dispute about the submission of those documents, namely the e-mails. Judge Rappaport asked her on the record, and she said no, she was not engaging Ms. Barnett as an attorney. Denying that Ms. Barnett was her attorney, it seems to me Ms. Barnett was under an obligation in these situations and in this circumstance not to go forward and exploit that information. I believe that's where Judge Prater was getting to, which is that having information and continuing this course of information that was flowing back and forth between the two of them don't the rules of professional responsibility, not in a minimalist sense, but in the sense of what would have been... But in the end, in terms of how much harm it might have done to your client, in the end, all the information she got from Richardson, she meaning Barnett, got from Richardson, was discoverable anyway, wasn't it? Well, no, not necessarily, Your Honor, because she got information that had to do with that might be submitted to the EOC. There was a statement that Ms. Richardson related where another employee overheard... Well, that's hearsay. I mean, so much of what Richardson disclosed to Barnett was hearsay. Whether it was ultimately hearsay or not, Your Honor, it certainly prejudiced our client. As Judge Prater said, we, meaning the defendants, should have had the opportunity to control what information was disclosed and the flow of that information through normal discovery channels. Because of the actions of Ms. Barnett, those channels remained open without knowledge of my client and without knowledge of Mr. Howe's client. And we didn't find out, and the ultimate prejudice, Your Honor, was there was a letter sent November the 18th, 2002, to the EOC, and the very basis of that letter were all these unsubstantiated rumors and allegations and, to use your phrase, Your Honor, secondhand information and hearsay, which the EEOC bought hook, line, and sinker. But the EEOC did its independent investigation. I quarrel with you, Your Honor. They did not do an independent investigation. What they did was they accepted almost verbatim the letter that Ms. Barnett had and turned it around into a probable cause finding against Mr. Howe's client and against my client. It was not an independent investigation. That was part of the problem, and that's why when we got to the hearing before Judge Prater, we indicated that if the case were not resolved, that we needed to be able to demonstrate at the time of trial how something that should not have even been an individual case was somehow converted into a class-based case against a small hotel and a small hotel management company. It was not our desire, and I said it at the time of the hearing. I've been practicing law 31 years. It's not my desire to be in a situation where I ever have to make a complaint against another attorney. I didn't want to do it then, but we felt ethically bound, both professionally and as a matter of representation to our clients, to bring this to the attention of the court when we saw that the matter was not going to get resolved at a settlement conference. And furthermore, Judge Prater, at the time of the settlement conference, indicated to Ms. Barnett and the EOC that this was an issue that was going to surface if, in fact, the case did not get settled. I see my time is up. But you didn't rely on 4.2 either, right? We did not rely on it in the lower court, Your Honor. In the hearing before Judge Prater, Judge Prater raised that sua sponte, and we addressed it, and we had concerns because it does speak of managerial authority. What Judge Prater found, and I think what's at play here, is that even though Ms. Richardson was not a manager, she was in a position, uniquely in a position, of being able to disclose very confidential, proprietary, and attorney-client-privileged information to Ms. Barnett. She was analogizing her to be the right hand of the CEO, the human resources director, the captain of the ship, the arms, legs, ears, eyes of management. Only because of a lack of a hierarchical structure in the company, Your Honor. Thank you very much. Thank you. Thank you, Your Honor. Very briefly, I point the court to the Glenn Mead decision in our brief from the Third Circuit. It says the curtain of protection for communications comes down when you seek to become a client, when you are a prospective client. It starts then and there. That's why I asked you the question. When she came in and met with Barnett the first day, but she never did become a client, so let's assume anything that she told her in that first meeting was privileged. She never became a client, so anything afterwards was not privileged. What we're missing is this is in corporate practice, okay? My bar admission says attorney and counselor. If you look at those later emails, he says, go to your employee assistance program. You're breaking down through anxiety. Cut back your spending. You're going to lose your job. These are things employment lawyers do to hold the client together. We call it hand-holding, okay? So it's just not, Your Honor, formalized with a written, okay? She was the lawyer for six weeks, okay? I don't think there are any clearly erroneous issues here. This is all fact-finding on a paper record. There was an oral argument. There was no testimony from a witness stand. Third point, under Rule 4.2, I think there is, when the defense lawyer says she's not a manager, when the EEOC investigators speak to Richardson because she's not a manager, when Barnett does an inquiry and satisfies herself that she's not a manager, when the district judge, in her opinion, says it is unsettled, and in the oral argument she says it's unsettled, and when the reporter in Comment 6 says managerial concept is vague and overly broad, a lawyer practicing, even one with 30 years' experience, okay, cannot know what conduct is prohibited. And when you can't safely guide yourself among the rule, that's a due process violation. And that's why they changed the managerial concept in this out. Lastly, Your Honor, this thing that they just adopted, whatever she sent them, the testimony, the statement by the EEOC's counsel at the oral argument was our investigator interviewed all of these witnesses separately. There was no cutting and pasting to make a conclusion. This is a very important matter. Thank you, Your Honors. We will take the case under advisement. If you want to take a break, you want to keep on going.